# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SEAN SWEENEY,

      Plaintiff,

      v.

ENFIELD BOARD OF EDUCATION,

      Defendant.

No. 3:14-cv-01511 (MPS)

## MEMORANDUM OF DECISION

Plaintiff Sean Sweeney, a high school teacher, brought this action against the Enfield Board of Education ("EBE").  The EBE now moves for summary judgment on the only remaining claim: that the EBE violated Sweeney's substantive and procedural due process rights under the Fourteenth Amendment of the U.S. Constitution by suspending him from his employment, including a 20-day suspension without pay (Count Two), following an inquiry into whether he had made inappropriate remarks to students.[1] (ECF No. 30.) For the reasons set forth below, the Court GRANTS the EBE's motion for summary judgment.

## I.    Factual Background[2]

---

[1] Sweeney's complaint alleges that the 20-day suspension also violates the Connecticut Constitution. To the extent that it is not abandoned, the Court declines to exercise supplemental jurisdiction over Sweeney's state law claim. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial ... the state claims should be dismissed as well."); 28 U.S.C. § 1367(c)(3).

[2] The following facts are from parties' Local Rule 56(a) Statements and the documents cited therein and are undisputed unless otherwise stated.

Since August 2001, Sweeney has been employed by the EBE as a tenured high school social studies teacher at Fermi High School. (Defendant's Local Rule 56(a)1 Statement, ECF No. 33 ("Def.'s L.R. 56(a)1 Stmt.") ¶¶ 1-3; Plaintiff's Local Rule 56(a)2 Statement, ECF No. 39 ("Pl.'s L.R. 56(a)2 Stmt.") ¶¶ 1-3.) Sweeney is a member of the Enfield Teacher's Association ("ETA") and subject to the collective bargaining agreement ("CBA") between the ETA and the EBE. (Def.'s L.R. 56(a)1 Stmt. ¶ 4; Pl.'s L.R. 56(a)2 Stmt. ¶ 4.) The CBA provides that "No teacher shall be suspended . . . without just cause. A teacher suspended . . . as a disciplinary matter shall receive advanced notice of the suspension . . . and shall be entitled to receive a specific statement of reasons in writing and have representation from the [ETA]." (Def.'s L.R. 56(a)1 Stmt. ¶ 5 (citations omitted); Pl.'s L.R. 56(a)2 Stmt. ¶ 5.) The CBA also contains a four-step grievance procedure. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 6-7; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 6-7.) Level One of the grievance procedure "is to the Principal or immediate supervisor; Level Two is to the Superintendent; Level Three is to the Board; and Level Four is to an Impartial Arbitration conducted by the American Arbitration Association, the decision of which is binding." (Def.'s L.R. 56(a)1 Stmt. ¶ 7; Pl.'s L.R. 56(a)2 Stmt. ¶ 7.) Only the ETA may bring a grievance to impartial arbitration at Level Four. (Def.'s L.R. 56(a)1 Stmt. ¶ 8; Pl.'s L.R. 56(a)2 Stmt. ¶ 8.)

**A.  Earlier Incidents**

Sweeney admits that the EBE subjected him to discipline in two instances prior to the instance that triggered this lawsuit (Pl.'s L.R. 56(a)2 Stmt. ¶ 9), but he generally denies the conduct that the EBE attributes to him that resulted in the two prior instances of discipline. (*Id.* ¶¶ 11-13.) According to the EBE, in 2012 Student A reported to his guidance counselor that when another student asked Student A "how's your face," Sweeney stated, "well, it's killing me." (Def.'s L.R. 56(a)1 Stmt. ¶ 12.) Student A later gave a statement confirming that Sweeney

made this comment. (*Id.* ¶ 13.) According to the EBE, when school administrators asked, Sweeney neither confirmed nor denied making the statement to Student A and admitted that he used profanity in his classroom. (*Id.* ¶ 14.) Sweeney, however, denies ever making such a statement to Student A, states that "Defendant has not produced the statement that is referred to," and denies that he used profanity. (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 12-14 (citing Sweeney Aff. ¶ 5).) Sweeney says that it was his co-teacher, the now-retired Kenneth Lessard, who said "well, it's killing me." (Def.'s L.R. 56(a)1 Stmt. ¶ 15; Pl.'s L.R. 56(a)2 Stmt. ¶ 15.)

The EBE states that someone complained to school administrators that Sweeney had referred to Student B, who is African American, as his "black brother" and his "brother from another mother." (Def.'s L.R. 56(a)1 Stmt. ¶ 16.) Sweeney denies that there was ever such a complaint, as he never received notice of one. (Pl.'s L.R. 56(a)2 Stmt. ¶ 16.) Sweeney admits that he called Student B his "black brother" and that Student B called Sweeney his "white brother" and his "brother from another mother." (Def.'s L.R. 56(a)1 Stmt. ¶¶ 17-18; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 17-18.) Sweeney denies that he ever agreed with school administrators that his comments to Student B were inappropriate and denies that he ever apologized for the events involving Student A and Student B. (Def.'s L.R. 56(a)1 Stmt. ¶¶19-20; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 19-20.) Sweeney admits that he "expressed regret that his actions were misconstrued" and that school administrators issued him a letter of discipline as a result of the incidents involving Students A and B. (Def.'s L.R. 56(a)1 Stmt. ¶¶20-21; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 20-21.) Sweeney "did not grieve this letter of discipline." (Def.'s L.R. 56(a)1 Stmt. ¶ 22; Pl.'s L.R. 56(a)2 Stmt. ¶ 22.)

In March of 2013, Sweeney was the girls' softball coach, and Student C was on the junior varsity softball team. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 24-26; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 24-26.)

During that month, school administrators received a complaint from the mother of Student C regarding a text message that Sweeney had sent to Student C. (Def.'s L.R. 56(a)1 Stmt. ¶ 23; Pl.'s L.R. 56(a)2 Stmt. ¶ 23.) Sweeney admits that, on November 30, 2012, at 3:47 p.m., he sent a text to Student C on her mother's cell phone that stated: "Sing along... foreeeeeverrr aloooone..foreeeeeverrr aloooooone." (Def.'s L.R. 56(a)1 Stmt. ¶ 30; Pl.'s L.R. 56(a)2 Stmt. ¶ 30.) The EBE states that the phrase "forever to be alone" was used by students to refer to unattractive girls and boys and indicated that they would never find a partner. (Def.'s L.R. 56(a)1 Stmt. ¶ 29.) Sweeney denies this. (Pl.'s L.R. 56(a)2 Stmt. ¶ 29.) He asserts that the "text was sent as a joke in response to several texts sent by the student" to him and that "[t]he message was sent in reference to a comment made by several of the girls that . . . Sweeney was also part of the 'Forever Alone Club.'" (Pl.'s L.R. 56(a)2 Stmt. ¶ 30.) Defendant states that Student C's mother discovered the message on March 26, 2013, and reported it to the Defendant. (Def.'s L.R. 56(a)1 ¶ 32.) Sweeney denies that it was possible that the mother could have discovered the message on March 26, 2013, because the message was sent on November 30, 2012. (Pl.'s L.R. 56(a)2 Stmt. ¶ 31.) Sweeney admits that school administrators placed him on paid administrative leave, effective March 26, 2013, pending investigation into the allegations surrounding his text message to Student C, and that his duties as softball coach were suspended during that time. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 33-34; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 33-34.) Sweeney denies that an investigation was ever conducted, but admits that Christopher Drezek, Deputy Superintendent of Enfield Public Schools (Def.'s L.R. 56(a)1 Stmt. ¶ 111; Pl.'s L.R. 56(a)2 Stmt. ¶ 111), interviewed him regarding the text message. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 35-36; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 35-36.) Sweeney also admits that he was suspended for five days without pay as a result of this incident

and did not grieve the discipline. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 40-41; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 40-41.)

### B.  Incident of June 12, 2013

Sweeney admits that, on June 11, 2013, six boys— AK., A.C., J.J. C.C., A.M., and N.K.—left trash underneath their lunch table and Sweeney cleaned it up. (Def.'s L.R. 56(a)1 Stmt. ¶ 42; Pl.'s L.R. 56(a)2 Stmt. ¶ 42.) The EBE asserts that, according to "reports," Sweeney approached the five boys on June 12, 2013, "called himself and the boys 'dumb asses,' and told them that if they did not clean up that day, June 12, 2013, someone would be 'dead.'" (Def.'s L.R. 56(a)1 Stmt. ¶ 43.) Sweeney denies this account. (Pl.'s L.R. 56(a)2 Stmt. ¶ 43.) Sweeney admits that "A.K. reported [that Sweeney made] this [statement] to his parents, and his father, T.K., sent an email to Marilyn Cressotti, the Assistant Principal of Fermi, that afternoon, June 12, 2013," and after receiving the e-mail "Cressotti contacted T.K. and set up a meeting . . . with him the following morning, June 13, 2013 at 9:00 a.m." (Def.'s L.R. 56(a)1 Stmt. ¶¶ 44-45; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 44-45.)[3] During the meeting, A.K. wrote out the statement that Sweeney

---

[3] Although Sweeney's Local Rule Statement stated that he "lack[ed] sufficient knowledge to admit or deny" these facts stated by the Defendant (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 44-45), the Court considers such statements admitted. *See Hogan v. State of Connecticut Judicial Branch*, 220 F. Supp. 2d 111, 115 (D. Conn. 2002) ("A party responding to a motion for summary judgment presumably has conducted discovery and should have a reasonable, factually supported basis to admit or deny any factual assertions made in the case. Therefore, the court considers admitted any statement with which the plaintiff lacks sufficient knowledge to agree or disagree.") (citations omitted). Even if the Court were to interpret Sweeney's statements as claims that these events did not occur, "he has come forth with no evidence beyond his own assertions to support this contention." *Id*; *see* CT R USDCT L.Civ.R. 56(a)3 ("Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . [F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1 . . .").

had said to him the prior day as: "You guys left the lunch table a mess. I was the dumb ass who cleaned it up. Maybe today you can act like 6 y[ear] o[lds] instead of 5 y[ear] o[lds]. If you dumb asses leave the table dirty again someone will be dead tomorrow." (Def.'s L.R. 56(a)1 Stmt. ¶ 47.) Sweeney denies this because it is "not what [he] said" (Sweeney Aff. ¶ 21), but he does not cite admissible evidence that contradicts Defendant's assertion that A.K. wrote out such a statement. (Pl.'s L.R. 56(a)2 Stmt. ¶ 47.)[4]

### C.  Initial Inquiry By School Officials

Cressotti met with A.C., J.J., C.C., A.M, and N.K. (Def.'s L.R. 56(a)1 Stmt. ¶ 48; Pl.'s L.R. 56(a)2 Stmt. ¶ 48.)[5] A.C. reported that Sweeney had said: "There were papers on the floor and you know who picked them up? Not the lunch ladies, not the janitors—me. If I find papers on the floor again, you guys are dead." (Def.'s L.R. 56(a)1 Stmt. ¶ 49.) "J.J reported only that the 'lunch guy' came over and told them to pick up their trash." (*Id*. ¶ 50.) C.C. reported that Sweeney said, "If I find any more papers under that table today you guys are dead. This dumbass is who picked it up." (*Id*. ¶ 51.) A.M. could not recall anything from the incident. (*Id*. ¶ 52.) N.K reported that Sweeney said, "If I have to pick this up again you will be dead or my sorry ass will be picking them up." (*Id*. ¶ 53.) N.K. and C.C. provided written statements similar to their oral

---

[4] Sweeney also objects to A.K.'s statement on hearsay grounds. This objection is overruled, however, because the statement is not offered for the truth of the matter asserted. Rather, it is offered as evidence of its "effect on the hearer – evidence of what Administrators knew throughout the investigation" (ECF No. 40 at 1 n.1) and to show the basis on which administrators decided to discipline Sweeney.

[5] Although Sweeney's stated that he "lack[ed] sufficient knowledge to admit or deny this fact" the Court considers the statement admitted. *See* footnote 3, *supra*.

statements. (*Id*. ¶¶ 51-53.) Sweeney denies the students' versions of events. (Pl.'s L.R. 56(a)2 Stmt. ¶ 49-53 (citing Sweeney Aff. ¶¶ 22-24).)[6]

On June 13, 2013, Cressotti spoke to physical education teacher Mark Dube, who has lunch duty at the same time as Sweeney. (Def.'s L.R. 56(a)1 Stmt. ¶ 54; Pl.'s L.R. 56(a)2 Stmt. ¶ 54.) Dube reported that he had spoken with the boys that day, June 13, and that the boys had said that Sweeney had "threatened" them. (Def.'s L.R. 56(a)1 Stmt. ¶ 56.) Sweeney denies ever threatening the students. (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 55-56.)[7]

Cressotti also spoke to Sweeney on June 13, 2013, in the cafeteria during his lunch duty, and later that day in her office. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 57-59; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 57-59.) Sweeney told Cressotti that on June 11, 2013, the boys had left trash at their table and he had discussed it with them during lunch on June 12. (Def.'s L.R. 56(a)1 Stmt. ¶ 60; Pl.'s L.R. 56(a)2 Stmt. ¶ 60.) According to Sweeney, he approached the boys at their lunch table and said, "Listen you guys, you left a mess at lunch. You know who picked it up? Me. I was the dummy that picked it up. It's not the lunch ladies' job or the custodians' job. You are going to get me killed by the lunch ladies. If you don't pick up the trash you will go to the office." (Def.'s L.R. 56(a)1 Stmt. ¶ 62; Pl.'s L.R. 56(a)2 Stmt. ¶ 62.) Sweeney said that he did not swear at the kids.[8] (Def.'s L.R. 56(a)1 Stmt. ¶ 61; Pl.'s L.R. 56(a)2 Stmt. ¶ 61.)

---

[6] Sweeney also objects to the students' statements to Cressotti on hearsay grounds. These objections are overruled. *See* footnote 4.

[7] Sweeney also objects to Dube's statements to Cressotti on hearsay grounds. These objections are overruled. *See* footnote 4.

[8] The parties dispute whether this comment was unsolicited. (Def.'s L.R. 56(a)1 Stmt. ¶ 61; Pl.'s L.R. 56(a)2 Stmt. ¶ 61.)

On June 14, 2013, T.K. sent another e-mail—this time to Drezek—complaining about this incident involving his son and Sweeney. (Def.'s L.R. 56(a)1 Stmt. ¶ 64.) Sweeney denies the truth of the statements in the e-mail. (Pl.'s L.R. 56(a)2 Stmt. ¶ 64.)[9] Drezek reported the matter to the Enfield Police Department and the Department of Children and Family Services. (Def.'s L.R. 56(a)1 Stmt. ¶ 65; Pl.'s L.R. 56(a)2 Stmt. ¶ 65.)

### D.  June 14, 2013 Meeting with Sweeney and Further Inquiry

On June 14, 2013, Drezek and Newton met with Sweeney and ETA representative Tod Couture and explained that they were investigating a parent's complaint about the events of June 12, 2013. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 66-68; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 66-68.) The EBE states that, during this meeting, Sweeney was given a chance to provide his side of the story. (Def.'s L.R. 56(a)1 Stmt. ¶ 69.) Sweeney admits that, at the meeting he: (1) recounted his version of the story, (2) denied that he had used the word "dumb ass" or stated that "someone will be dead tomorrow." (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 70-72.) In his deposition, Sweeney testified that as of the end of the June 14 meeting, he had told Cressotti and Drezek all that had occurred at the cafeteria on the day in question. (Sweeney Depo. at 147, 171, 176, ECF No. 38-2 at 24, 46, 63.) [10] At the

---

[9] Sweeney objects to the statements in the e-mail on hearsay grounds. These objections are overruled. *See* footnote 4.

[10] Even though Sweeney recounted his version of the events of June 12, 2013, at the meeting, he denies that he was "given a chance to provide his side of the story," because:

> Although Mr. Sweeney was asked questions about what occurred and he verbally responded, he was not asked to provide a written statement of what occurred or given questions to respond to in writing so his version of what occurred could be confirmed and accurate. Notably, the student witnesses were all asked to provide written statements, but Mr. Sweeney was not. This was done so the defendant could manipulate what Mr. Sweeney said and not have a record of it. They could then credit the written statements they had over Mr. Sweeney's verbal statement. This is exactly what the defendant has done in this case. Thus, Mr. Sweeney was

end of the meeting, Sweeney was placed on paid administrative leave. (Def.'s L.R. 56(a)1 Stmt. ¶ 74; Pl.'s L.R. 56(a)2 Stmt. ¶ 74.)

Drezek interviewed Dube (Def.'s L.R. 56(a)1 Stmt. ¶¶ 76-77; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 76-77), and obtained written statements from C.C. and N.K. (Def.'s L.R. 56(a)1 Stmt. ¶ 81.) Sweeney denies that written statements were taken from C.C. and N.K., denies that they are accurate, and claims that the statements are inadmissible hearsay. (Pl.'s L.R. 56(a)2 Stmt. ¶ 81.) Sweeney's hearsay objections are overruled because the statements are not offered for their truth. (*See* footnote 4, *supra*.) Based on this investigation, "it was determined that" Sweeney had used the phrase "dumb ass" and stated that "someone would be dead" in his conversation with the boys at lunch. (Def.'s L.R. 56(a)1 Stmt. ¶ 82.) Sweeney denies this statement as lacking foundation and because he denies that he said such things, but he cites no admissible evidence to rebut the statement that this determination was made. (Pl.'s L.R. 56(a)2 Stmt. ¶ 82.)

Sweeney retained an attorney in August 2013 and declined representation by the ETA. (Def.'s L.R. 56(a)1 Stmt. ¶ 86; Pl.'s L.R. 56(a)2 Stmt. ¶ 86.) The school year ended on June 24, 2013, and Sweeney remained on paid administrative leave until September 2013. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 83-84; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 83-84.) At some point, the EBE offered Sweeney a "last chance agreement" and a 20-day suspension, which Sweeney declined. (Def.'s L.R. 56(a)1 Stmt. ¶85; Pl.'s L.R. 56(a)2 Stmt. ¶ 85.)

---

not allowed to give his version of the incident in a way that was fair and which could not be used by defendant to later contend Mr. Sweeney changed his story. (Def.'s L.R. 56(a)1 Stmt. ¶ 69.)

**E.  October 4, 2013 Meeting with Sweeney and Suspension Without Pay**

Sweeney received notice from Drezek that there would be a meeting on October 4, 2013, to discuss his employment and the results of the investigation, and Sweeney attended the meeting. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 88-90; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 88-90.) The EBE states that Sweeney was given the opportunity at the meeting to provide information relating to the allegations. (Def.'s L.R. 56(a)1 Stmt. ¶ 91.) Sweeney denies that he was given such an opportunity and states that "Drezek was in the process of finishing the typing of the disciplinary letter when the meeting began so the decision had already been made." (Pl.'s L.R. 56(a)2 Stmt. ¶ 91.) At the meeting, administrators informed Sweeney he was being suspended for twenty school days without pay, effective October 7, 2013, and would be expected to return to work on November 5, 2013. (Def.'s L.R. 56(a)1 Stmt. ¶ 92; Pl.'s L.R. 56(a)2 Stmt. ¶ 92.)

**F.  Post-Suspension Process**

On October 24, 2013, Sweeney sent a letter to Drezek indicating that he was grieving the suspension and waiving his right to union representation. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 94-95; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 94-95.) Sweeney's letter included a letter from his attorney, Kevin Greene, stating, among other things, that the investigation was incomplete, the suspension was too long, and there was not "just cause" for the suspension.  (Def.'s L.R. 56(a)1 Stmt. ¶¶ 96-98; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 96-98.)

Sweeney received notice on November 4, 2013, that his grievance hearing would take place on November 12, 2013, at 2:00 pm. (Def.'s L.R. 56(a)1 Stmt. ¶ 102; Pl.'s L.R. 56(a)2 Stmt. ¶ 102.) At the hearing, Sweeney again waived union representation. (Def.'s L.R. 56(a)1 Stmt. ¶ 105; Pl.'s L.R. 56(a)2 Stmt. ¶ 105.) Dr. Jeffrey Schumann, Superintendent of EPS (Def.'s L.R. 56(a)1 Stmt. ¶ 104), asked Sweeney which section of the CBA had been violated. (Def.'s

L.R. 56(a)1 Stmt. ¶ 108.) Sweeney answered by referring to the "just cause" provision and the letter from Greene. (Pl.'s L.R. 56(a)2 Stmt. ¶ 108.) The EBE states—and Sweeney denies—that Schumann provided Sweeney an opportunity to state whatever he chose during the hearing, but that Sweeney declined all such opportunities. (Def.'s L.R. 56(a)2 Stmt. ¶ 110; Pl.'s L.R. 56(a)2 Stmt. ¶ 110.) According to Sweeney, Schumann "did not provide me any opportunity to make any statements other than to tell him what the grievance was based on." (ECF 38-1 at 7). On November 18, 2013, Schumann issued a written response denying the Level 2 grievance because Sweeney "failed to identify and substantiate a violation of the [CBA]." (Def.'s L.R. 56(a)2 Stmt. ¶ 111; Pl.'s L.R. 56(a)2 Stmt. ¶ 111.)

The ETA's president, Gray Wanzer, submitted the grievance to the EBE as a Level Three grievance on December 2, 2013. (Def.'s L.R. 56(a)2 Stmt. ¶ 112; Pl.'s L.R. 56(a)2 Stmt. ¶ 112.) On December 9, Sweeney received notice that the hearing would be on December 17, 2013. (Def.'s L.R. 56(a)2 Stmt. ¶ 113; Pl.'s L.R. 56(a)2 Stmt. ¶ 113.) Sweeney requested that the hearing take place in Executive Session, and he again waived representation by the ETA. (Def.'s L.R. 56(a)2 Stmt. ¶¶ 116-17; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 116-17.)[11] There is no dispute that the EBE asked Sweeney questions (to which he responded), and he was provided the opportunity to present his grievance to the EBE (which he did). (Def.'s L.R. 56(a)2 Stmt. ¶¶ 118-19; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 118-19.) Specifically, Sweeney testified in his deposition that he received an opportunity to give his version of events. (Sweeney Depo. at 218-19, ECF No. 38-2 at 105-06). The EBE voted seven to one to deny Sweeney's grievance, and on December 18,

---

[11] Paragraphs 116-121 of the Defendant's Local Rule 56(a)1 Statement refer to "the hearing on November 12, 2013," but also refer to "the Board" and the "Level Three grievance." Thus, it appears that the November date is in error, and it should refer to the hearing on December 17, 2013, before the EBE.

2013, the chair of the EBE wrote to Sweeney informing him that his Level Three grievance had been denied. (Def.'s L.R. 56(a)2 Stmt. ¶¶ 121-22; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 121-22.)

Sweeney wrote to Couture on December 23, 2013, and asked that the ETA appeal the EBE's denial of his grievance. (Def.'s L.R. 56(a)2 Stmt. ¶ 123; Pl.'s L.R. 56(a)2 Stmt. ¶ 123.) The ETA notified the EBE on January 30, 2014, that the ETA's Professional Rights and Responsibilities Committee had decided not to submit Sweeney's grievance to arbitration. (Def.'s L.R. 56(a)2 Stmt. ¶ 125; Pl.'s L.R. 56(a)2 Stmt. ¶ 125.) On February 12, 2014, Attorney Greene wrote to Drezek and asked him to allow Sweeney "to resolve his grievance though binding arbitration with the Board of Education through the American Arbitration Association." (Def.'s L.R. 56(a)2 Stmt. ¶ 127; Pl.'s L.R. 56(a)2 Stmt. ¶ 127.) The EBE denied the request through counsel on February 18, 2014, because the CBA provides "that only the ETA, not an individual teacher, may determine whether a matter is meritorious enough to proceed to arbitration and, because the ETA ha[d] declined to take the matter to arbitration, the [EBE] [could not] grant Plaintiff's request." (Def.'s L.R. 56(a)2 Stmt. ¶ 128; Pl.'s L.R. 56(a)2 Stmt. ¶ 128.)

### G.  Procedural History of this Case

Sweeney's complaint originally named both the EBE and the ETA as defendants, and alleged that: (1) the EBE breached the Collective Bargaining Agreement ("CBA") with Sweeney (Count One); (2) the EBE's issuance of a 20-day unpaid suspension violated Sweeney's substantive and procedural due process rights under the U.S. and Connecticut Constitutions (Count Two); and (3) the ETA breached its duty of fair representation by refusing to submit Sweeney's grievance to arbitration. The ETA moved to dismiss Count Three for lack of subject matter jurisdiction, the Superior Court granted the ETA's motion, and the ETA was dismissed as

a defendant. The EBE then removed the case to federal court and moved to dismiss Count One

for lack of subject matter jurisdiction. This Court granted the motion to dismiss, finding that

Sweeney had failed to exhaust his administrative remedies. *See Sweeney v. Enfield Bd. of Educ.*,

No. 3:14-CV-01511 MPS, 2015 WL 4722969, at *1 (D. Conn. Aug. 10, 2015).

## II.    Legal Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as

to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving

party carries its burden, "the opposing party must come forward with specific evidence

demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654

F.3d 347, 358 (2d Cir. 2011) (citation omitted). An issue of fact is "material" if it "might affect

the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of America*,

234 F.3d 92, 97 (2d Cir. 2000) (citation omitted). "A dispute regarding a material fact is genuine

if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation

marks and citation omitted). On summary judgment, a court must "construe the facts in the light

most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir.

2013) (quotation marks and citation omitted).

## III.   Discussion

The Due Process clause of the Fourteenth Amendment of the U.S. Constitution provides

that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of

law . . . ." U.S. Const. amend. XIV, § 1. Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. There is no dispute that the EBE is a "person" acting under color of state law for purposes of 42 U.S.C. § 1983. Sweeney claims that, as a public school employee, he has both a liberty and a property interest in his employment with the EBE, and he was deprived of those interests without due process when the EBE suspended him for twenty days without pay. (Compl. ¶¶ 14-16.)

### A.  Procedural Due Process

"A procedural due process analysis proceeds with two questions. '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir 2004) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506 (1989)).

Defendant concedes, for the purposes of this motion, that Sweeney has a property interest in his employment, by virtue of the "just cause" provision in the CBA quoted above. Defendant argues, however that Sweeney does not have a liberty interest in his employment. (Defendant's Memorandum in Support of Motion for Summary Judgment, ECF No. 32 ("Def.'s Br.") at 20-23.) In his opposition brief, Sweeney does not contend that he has a liberty interest, and therefore he abandons that argument. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). Nevertheless, the

Court need not decide whether Sweeney had a liberty interest in his reputation because, as shown below, he received all the process that was due. *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006) ("the availability of adequate process defeats a stigma-plus claim").

> In determining whether Sweeney received due process, the Court must consider:
>
> (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; (3) the government's interest, including the possible burdens of alternative procedures. While the ultimate conclusion about procedural adequacy under *Mathews* turns on the full set of pre- and post-deprivation procedures available, courts often analyze pre- and post-deprivation procedures separately.

*O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 319 (2d Cir. 2002)). "Pre-deprivation procedures are evaluated not only in light of the general *Mathews* inquiry, but also in terms of the specific due process principle mandating that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *O'Connor*, 426 F.3d at 197 (citations and internal quotation marks omitted). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545, 105 S. Ct. 1487, 1495, 84 L. Ed. 2d 494 (1985). Sweeney has a private interest in avoiding suspension of his employment and in the 20 days of pay of which he was deprived. The EBE has an interest in quickly and appropriately punishing teachers who it believes have threatened or otherwise made inappropriate comments to students. Both parties share an interest in "avoiding disruption and erroneous decisions." *Loudermill*, 470 U.S. at 544.

### 1.    Pre-Deprivation Procedures

Sweeney argues that there are genuine issues of fact concerning whether he received "proper pre-deprivation process." (Plaintiff's Opposition to Motion for Summary Judgment ECF No. 38 ("Pl.'s Opp. Br.") at 26.) He argues that "it can be inferred from fundamental deficiencies" in the EBE's investigation—such as failing to obtain a written statement from Sweeney or a copy of a related police report—that the EBE acted "with the intent to harm him or get back at him for prior disciplinary actions." (*Id.* at 27-28.) Due process does not give the plaintiff a right to a particular type of investigation, however, and Sweeney's conclusory allegations about the EBE's intentions are irrelevant to the due process inquiry. *See Feliciano-Angulo v. Rivera-Cruz*, 858 F.2d 40, 43 (1st Cir. 1988) (noting that public employee's argument questioning the "true motive" behind his dismissal was "not relevant to the plaintiff's procedural due process claim.") [12]

"Because pre-deprivation process serves a limited function [as an initial check against mistaken decisions], the Constitution mandates only that such process include, at a minimum,

---

[12] Moreover, those allegations are not supported by the record. Sweeney asks the Court to infer from the two incidents of earlier discipline, and from alleged missteps in the investigation of the lunchroom incident—such as the taking of written statements from students and not from Sweeney—that the EBE acted out of animus towards Sweeney and "intended to discipline Mr. Sweeney regardless of what the investigation revealed." (ECF No. 38 at 17.) But a court assessing a summary judgment  record is required only to draw *reasonable* inferences in the non-movant's favor; it is not required—or permitted—to make speculative leaps. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) ("conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment") (internal citations omitted). Sweeney has pointed to nothing in the record that either the school officials who investigated him, or the Superintendent who upheld the suspension without pay, or the members of the Board who voted to uphold the suspension acted out of animus towards him or were seeking to discipline him "regardless of what the investigation revealed." At most, the evidence Sweeney points to—and reasonable inferences drawn in his favor therefrom—suggest that the investigation and suspension were negligent or sloppy, not that they were effectuated in bad faith.

notice and the opportunity to respond." *O'Connor*, 426 F.3d at 198 (citations and internal quotation marks omitted). A tenured teacher like Sweeney "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 1495, 84 L. Ed. 2d 494 (1985) (describing process required for pre-termination hearing). "The requisite hearing is a minimal one designed to serve as an initial check against mistaken decisions," and is "not intended to resolve the propriety of the discharge. *Faghri v. Univ. of Conn.*, 621 F.3d 92, 99 (2d. Cir. 2010) (internal quotation marks and citations omitted). *See also Locurto v. Safir*, 264 F.3d 154, 174 (2d Cr. 2001) (neutral adjudicator not a necessary component of due process at pre-termination hearing for public employee).

According to the undisputed facts, on June 11, 2013, six boys— A.K., A.C., J.J. C.C., A.M., and N.K.—left trash underneath their lunch table and Sweeney cleaned it up. (Def.'s L.R. 56(a)1 Stmt. ¶ 42; Pl.'s L.R. 56(a)2 Stmt. ¶ 42.) A.K. reported to his parents that Sweeney made a statement to the boys on June 12, 2013, calling himself and the boys "dumb asses," and telling them that if they did not clean up that day, someone would be "dead." A.K.'s parents complained to the school about Sweeney's statements, and Cressotti set up a meeting with A.K.'s parents on June 13, 2013. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 44-45; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 44-45.) Cressotti spoke to Sweeney twice on June 13, 2013, (Def.'s L.R. 56(a)1 Stmt. ¶¶ 57-59; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 57-59), and Sweeney told her that the boys had left trash at their table on June 11, 2013, and he had discussed it with them during lunch on June 12. (Def.'s L.R. 56(a)1 Stmt. ¶ 60; Pl.'s L.R. 56(a)2 Stmt. ¶ 60.) According to Sweeney, he approached the boys at their lunch table and said, "Listen you guys, you left a mess at lunch. You know who picked it up? Me. I was the dummy that picked it up. It's not the lunch ladies' job or the custodians' job. You are going to

get me killed by the lunch ladies. If you don't pick up the trash you will go to the office." (Def.'s L.R. 56(a)1 Stmt. ¶ 62; Pl.'s L.R. 56(a)2 Stmt. ¶ 62.) Sweeney said that he did not swear at the boys. (Def.'s L.R. 56(a)1 Stmt. ¶ 61; Pl.'s L.R. 56(a)2 Stmt. ¶ 61.) Thus, Sweeney had the opportunity to present his side of the story to Cressotti on June 13, 2013.

Drezek and Newton then met with Sweeney, in the presence of ETA representative Couture, and explained that they were investigating a parent's complaint about the events of June 14, 2013. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 66-68; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 66-68.) Although Sweeney "denies" that he "was given a chance to provide his side of the story" at the meeting, he admits that he recounted his version of the story and denied using the phrase "dumb ass" or stating that "someone will be dead tomorrow." (Pl.'s L.R. 56(a)2 Stmt. ¶¶ 69-72.) Further, a closer examination of his "denial" that he was given a chance to present his side of the story in the June 14 meeting shows that it cites no supporting evidence, and is actually simply a denial that he gave a *written* statement. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 69.)  Indeed, in his deposition he testified repeatedly that, as of the end of the June 14 meeting, he had told Cressotti and Drezek all that had occurred at the cafeteria on the day in question. (ECF No. 38-2 at 34, 48, 63). Also, the fact that Sweeney denied that he used certain phrases that the boys reported he had said suggests that Sweeney was informed of the evidence against him, and he offers no evidence to suggest that the EBE failed to explain the evidence it had received. Thus, during the June 14, 2013 meeting with Drezek, Newton, and Couture, Sweeney was again given notice of the charges and the evidence against him and had another opportunity to present his side of the story. Sweeney was placed on paid administrative leave at the end of the meeting (Def.'s L.R. 56(a)1

Stmt. ¶ 74; Pl.'s L.R. 56(a)2 Stmt. ¶ 74) and remained on paid administrative leave until September 2013. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 83-84; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 83-84.)[13]

       Sweeney had received notice from Drezek that there would be a meeting on October 4, 2013, to discuss his employment and the results of the recent investigation, and Sweeney appeared at the meeting at the scheduled time. (Def.'s L.R. 56(a)1 Stmt. ¶¶ 88-90; Pl.'s L.R. 56(a)2 Stmt. ¶¶ 88-90.) The EBE states that Sweeney was given the opportunity at the meeting to provide information relating to the allegations. (Def.'s L.R. 56(a)1 Stmt. ¶ 91.) Sweeney denies that he was given such an opportunity and states that "Drezek was in the process of finishing the typing of the disciplinary letter when the meeting began so the decision had already been made." (Pl.'s L.R. 56(a)2 Stmt. ¶ 91.) The administrators informed Sweeney he was being suspended for twenty school days without pay, effective October 7, 2013, and would be expected to return to work on November 5, 2013. (Def.'s L.R. 56(a)1 Stmt. ¶ 92; Pl.'s L.R. 56(a)2 Stmt. ¶ 92.) Accepting Sweeney's version of the facts, in which he was not given an opportunity to provide information relating to the boys' the allegations at the October 4, 2013 meeting, the Court nonetheless finds that the undisputed facts show that Sweeney had already received notice, an explanation of the EBE's evidence against him, and an opportunity to respond with his side of the story back in June 2013—well before the October 4, 2013 meeting. This is all the pre-deprivation process he was due.

---

[13] It is unclear whether Sweeney's Due Process claim challenges both the suspension with pay in June 2013 and the suspension without pay in October 2013, or just the latter. *Compare* Compl. Count Two, ¶¶ 16-17 *with* Count One, ¶ 12. It is also unclear whether, in spite of the language of the CBA, Sweeney had a property interest in avoiding a *paid* suspension from his employment. *See, e.g., Gugliotti v. Miron*, No. 3:08-CV-442 JCH, 2010 WL 3025223, at *8-9 (D. Conn. July 30, 2010). I need not decide this issue, however, because the undisputed facts show that Sweeney received notice and an opportunity to be heard before both suspensions.

2.      *Post-Deprivation Procedures*

Sweeney argues that the CBA-mandated post-deprivation procedures were inadequate and summary judgment is not appropriate because: (1) there are issues of fact concerning whether the Level Two grievance hearing before Schumann "was really a 'hearing' in the due process sense or a perfunctory five minute meeting where Dr. Schumann showed no interest in doing anything other than rubber stamping the foregone conclusion . . . ." (ECF No. 38 at 29); (2) Sweeney was unfairly denied the opportunity to have his attorney present to question the Defendant's witnesses in the Level Three hearing; and (3) Sweeney was unfairly denied "the opportunity to present witnesses and cross examine the [D]efendant's witnesses in a fair hearing before a neutral decision-maker to determine whether he was disciplined for just cause despite requesting the opportunity to do . . . ." (*Id.* at 30.)

The evidence Sweeney cites does not support his first and third claims. The issue of whether the Level Two hearing would have satisfied due process on its own is immaterial, because Sweeney also received a lengthier Level Three hearing.  And there is no evidence that Sweeney was denied an opportunity to present evidence or cross-examine witnesses.[14] Sweeney denies that he had the opportunity to question Drezek and Schumann at the Level Three hearing, but in support of this denial he cites only his affidavit, which states that he was "not allowed to *have my attorney* question Mr. Drezek and Dr. Schumann or any other witnesses." (Pl.'s L.R. 56(a)2 Stmt. ¶ 120; ECF No. 38-1 at 8 (emphasis added).) Further, Sweeney testified in his

---

[14] The EBE points out that in the context of a temporary suspension, due process does not necessarily require that Sweeney have the opportunity to cross-examine witnesses in a temporary suspension hearing. *See Ryan v. New York City Dep't of Educ.*, No. 11-CIV.-1628, 2011 WL 4899923, at *5 (E.D.N.Y. Oct. 13, 2011); *Oswald v. Waterloo Bd. of Educ.*, No. C02-2050, 2003 WL 22284654 (N.D. Iowa Sept. 22, 2003). I need not decide this issue because the facts show that Sweeney did have the opportunity to cross-examine witnesses.

deposition that he, Drezek, and Schumann were all present for the "evidence portion" of the hearing (which was held in executive session, at Sweeney's request) (Sweeney Depo. at 215-17, ECF No. 38-2 at 102-04), that he presented his version of events to the Board and responded to the Board's questions, and that the Board had received a letter from his attorney setting forth his version of events in full. (Sweeney Depo. at 290-91, ECF No. 38-2 at 177-78.)[15] Finally, Sweeney offers no evidence to suggest that the Board was a biased adjudicator.

Sweeney's remaining claim that he was denied the assistance of his private lawyer (*but see* note 15, *supra*) does not rise to the level of a due process violation.  The amount of process due to Sweeney in his post-deprivation hearing "depends on a balancing of the strength of the individual's interests against the countervailing state interests." *Carfora v. City of New York*, 705 F. Supp. 1007, 1010 (S.D.N.Y. 1989) (citing *Mathews,* 424 U.S. at 335).  In the context of post-deprivation hearings for tenured employees facing *termination*, courts have differed as to whether due process requires a right to private counsel. *See, e.g. Riggins v. Bd. of Regents of Univ. of Nebraska*, 790 F.2d 707, 712 (8th Cir. 1986) (listing "four requirements of due process... in the discharge of a tenured professor from a state university," not including the right to counsel); *Carter v. W. Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985) (due process "requires that the discharged employee be permitted to … have the assistance of counsel"). However, in the context of a temporary suspension, less process is due. "[A]ccount must be taken of the *length* and *finality* of the deprivation." *Gilbert v. Homar*, 520 U.S. 924, 932

---

[15] In his deposition, Sweeney testified that he was allowed to choose between having the evidence portion of the hearing before the EBE in open session, in which case his attorney could attend but not question witnesses or otherwise "represent [him]," or in executive session, in which case his attorney could not attend at all. He chose the latter option because he wanted privacy. (ECF No. 38-2 at 102-04).

(1997) (internal quotation marks and citations omitted). Sweeney's property interest in 20 days of paid employment, or any liberty interest he has in damage to his reputation from the suspension, "commands less procedural safeguards of the individual's rights than a criminal trial or a dismissal from tenured employment." *Carfora*, 705 F. Supp. at 1010 (citation omitted).[16] *See also Thomas v. Zaharek*, 289 F. Supp. 2d 167, 176–77 (D. Conn. 2003) ("the extent of the procedural protections related to . . .  suspension may very well not be as great as in the case of termination."); *cf. Goss v. Lopez*, 419 U.S. 565, 583 (1975) (in case involving 10-day suspension of students from school, school not required to "afford student the opportunity to secure counsel, to confront and cross-examine witnesses, or to call his own witnesses….").

Further, in the Second Circuit, "CBA-mandated grievance procedures are routinely (though not always) held to provide adequate post-deprivation process." *O'Connor*, 426 F.3d at 198 (2d Cir. 2005) (citations omitted). The Second Circuit has "held on several occasions that there is no due process violation where, as here, pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement.... The Due Process Clause is implicated only when plaintiffs can establish that the grievance procedures in a collective bargaining agreement are an inadequate remedy." *Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008) (involving deferral of employee wages; citations omitted). Specifically, during CBA-mandated grievance procedures, a grievant has no due process right to a private attorney. *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 198 (E.D.N.Y. 1998) ("A grievant has no right to a private attorney, or to require a union to utilize a lawyer, at an arbitration.").

---

[16] And to the extent Sweeney has a property interest in avoiding unpaid suspension (see note 13, supra), even less process was due.

Sweeney attended a Level Two grievance hearing in which he waived union representation, and then submitted his grievance to Level Three for a hearing in front of the EBE. At the Level Three hearing, Sweeney submitted a letter from his attorney, waived representation by the ETA, and elected to proceed in closed session (outside the presence of his attorney). In addition, the EBE asked Sweeney questions (to which he responded), and he was provided the opportunity to present his grievance to the EBE (which he did). The Court finds that, under the circumstances, Sweeney received constitutionally adequate pre- and post-deprivation procedures for both his paid and 20-day unpaid suspension. His procedural due process claim therefore fails as a matter of law.

### B.  Substantive Due Process

"The protections of substantive due process are available only against egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." *Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (citations and internal quotation marks omitted) (alterations omitted). The EBE's conduct—in investigating the charges against Sweeney and providing him with pre- and post-deprivation process—does not rise anywhere near the level of egregious, brutal, offensive or conscience-shocking. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation marks and citations omitted). Thus, an unfair investigation resulting in discipline does not violate substantive due process. *See, e.g., Bertram v. Metro. Transp. Auth.*, No. 13 CIV. 338 RA, 2014 WL 748933, at *8 (S.D.N.Y. Feb. 26, 2014) ("seemingly arbitrary

and perhaps unfair" discipline and harassment not sufficient to state a claim for violation of substantive due process); *Williams v. Perry*, 960 F. Supp. 534, 539 (D. Conn. 1996) ("Derogatory remarks, reassignments, lack of assignments, higher standards of performance and conduct, and harsher discipline all fail to rise to the level of the delict necessary to set forth a substantive due process claim.").

Moreover, "where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process." *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). The *Velez* court emphasized that "what would serve to raise defendant's actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations." *Id.* The facts that Sweeney alleges in support of his claim that EBE violated his substantive due process rights are the same that he alleges in support of his claim that the EBE violated his procedural due process rights. Thus, Sweeney's substantive due process claim also fails as a matter of law because it is redundant and is subsumed within his claim for violation of procedural due process. *See Hubbard v. Hanley*, No. 09 CV 10265 HB, 2010 WL 1914989, at *5 (S.D.N.Y. May 12, 2010).

## IV.    Conclusion

For the foregoing reasons, the EBE's motion for summary judgment is GRANTED. The Family Educational Rights and Privacy Act ("FERPA") protects the confidentiality of certain educational information contained in the EBE's motion for summary judgment, memorandum of law, and supporting exhibits. Therefore, the Court finds that there are clear and compelling reasons to seal the EBE's memorandum of law and supporting exhibits. Because Defendants filed a redacted public version of the memorandum of law and supporting exhibits—

in which only confidential material is redacted—the Court finds that sealing these documents is narrowly tailored to serve the clear and compelling reasons identified. Therefore, the Court GRANTS the EBE's motion to seal its Memorandum of Law in support of its Motion for Summary judgment, Local Rule 56(a)1 Statement and Exhibits A, B, C, E, G, J, K, L, M, N, O, Q, R and Z. (ECF No. 31.) The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                August 18, 2016